## THE THOMAS MORGAN.

(District Court, D. South Carolina. June 12, 1903.)

1. SALVAGE—RAISING SUNKEN TUG—COMPENSATION.

Libelant at his own expense and risk raised a tug which had sunk in 26 feet of water in a river, the service requiring two weeks' work night and day, and an expenditure of over $1,000. When raised, the tug was not in condition for use, and he recalked and repaired her, putting her in as good condition as before she sunk. She was in imminent danger of becoming a total loss owing to the quicksands and rapid current of the river, and the salvage work was ingeniously and skillfully done. After being raised she was valued at from $4,000 to $8,000. *Held*, that libelant should be awarded one-fourth the proceeds of her sale as salvage compensation, besides the expense incurred, and next after that the cost of the repairs made, which would be considered as in the nature of a continuation of the salvage service, and entitled to rank next as a lien.

2. SAME—SALVAGE SERVICES—FURNISHING MATERIAL FOR USE IN SALVAGE OPERATIONS.

The mortgagee of a tug which had been wrecked and sunk in a river let to the owner two lighters "under hire expressly stipulated," although no price was fixed, the intention being to use them in salving the tug. They were taken to the wreck and remained in the vicinity four days, but nothing was done and no plans made for raising the vessel. After that another undertook to raise the vessel, and did so, using one of the lighters, the other being returned. The man in charge of the lighter performed no service except as watchman. *Held*, that the mortgagee was not a salvor, and that his claim for the hire of his lighter was not entitled to rank as a salvage claim.

3. MARITIME LIENS—PRIORITIES—LIEN FOR SUPPLIES.

Liens acquired by virtue of a state statute for supplies furnished a vessel during the year prior to her sale in admiralty are entitled to equal rank and to be paid pro rata, in the absence of any special circumstances or equities.

4. SAME—WAIVER OF LIEN—TAKING MORTGAGE TO SECURE ADVANCES.

The taking of a mortgage on a vessel to secure future advances for supplies is not inconsistent with the claiming of a maritime lien given by statute for supplies subsequently furnished.

In Admiralty. Libel to recover for salvage services.

Bryan & Bryan, for libelants.
Nathans & Sinkler, for respondents.

BRAWLEY, District Judge. O. R. Craig, master and managing owner of the steam tug Thomas Morgan, in May, 1901, entered into a written agreement with E. P. Burton & Co., whereby the said tug was employed in the towing of logs from the upper branch of the Cooper river to the mill of Burton & Co. near the city of Charleston, and for other towage services, on terms thereby stipulated, settlements to be made on the 10th day of each month for all work

¶ 1. Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.

¶ 3. Maritime liens for supplies and services, see note to The George Dumas, 15 C. C. A. 679. Maritime liens created by state laws, see note to The Electron, 21 C. C. A. 21.

¶ 4. Waiver and extinguishment of maritime liens, see note to The Nebraska, 17 C. C. A. 102.

See Maritime Liens, vol. 34, Cent. Dig. § 83.

done in the previous month, and a short time thereafter entered upon such service. On October 11, 1901, the owners of the said tug made and delivered their promissory note to said Burton & Co., payable in one year from the date, and executed and delivered to Burton & Co. a mortgage of the tug Thomas Morgan, which was duly recorded. This note and mortgage was intended to secure Burton & Co. for any advances made to the tug Morgan. While engaged in towing some rafts of timber under this contract, the tug Thomas Morgan, on January 13, 1903, was sunk in Cooper river in about 26 feet of water. On February 10, 1903, Samuel J. Pregnall filed his libel in this court for salvage services rendered in raising and saving said tug, and for certain repairs made to render her seaworthy after she was raised, and in the same libel the libelant demands payment for certain repairs made, materials furnished, and labor performed on the said tug in the year 1902, to secure which statutory liens were recorded August 2 and August 27, 1902. Intervening libels were thereafter filed by E. P. Burton & Co., the Riverside Iron Works, the Consumers' Coal Company, Thomas Duggan, Frank S. Smith, engineer, and E. E. Wehmann, which will be considered in order, and the tug Thomas Morgan was seized and is now in the possession of the marshal of this court.

Pregnall commenced work January 19, 1903, prosecuted the same continuously night and day, and succeeded in raising her January 31, when she was towed to his marine railway in the city of Charleston, the tug engaged in towing her pumping at the same time to keep her from sinking, and after she was put on the ways she was recalked and refastened, whereby, according to the testimony, she was put in as good condition as before the sinking. He has filed an account of the expenses incurred by him as salvor, amounting to $1,039.35. The bill for preservation and restoration after she was raised amounts to $293.32. The salvage operations were ingenious. The tug was in great danger of being a total loss by reason of the great depth of water and swift current and quicksands. There was great risk of her filling with sand, which is alive in the swift currents. The work was laborious and continuous during nearly two weeks, and, as the method adopted was the use of the lifting power of the tides, the work was done at night as well as in the day, and, the weather being cold, Pregnall, who was long past middle life, exposed his health to considerable risk. It is doubtful that any other person in this port is possessed of the skill, appliances, and ingenuity which this salvage service required, and, as he incurred expenses of about $1,000, which would have been entirely lost if he failed in his efforts, he is entitled to an award as a highly meritorious salvor. It is difficult to fix a definite sum as compensation, because of doubt as to the value of the tug. Owing to the peculiar and lamentable conditions now prevailing at this port, nothing is more difficult than to determine the real value of any water craft. Witnesses for the libelant have testified that the Morgan is worth $8,000. Counsel for intervening libelants insist that this valuation is grossly excessive, and that she is not likely to bring at public sale more than one-half of this sum. A decree will be entered allowing Samuel J. Pregnall,

libelant, one-fourth of the amount which the tug may bring at public sale. It will also provide for the repayment to him of the sum of $1,039.35, expenses incurred in the salvage service, and next thereafter, and after the costs and expenses of the court, will be allowed the sum of $293.32, the bill for repairs, preservation, and restoration of the tug after she was raised, as I am of opinion that the tug when raised was not in condition to do any business, and would have been of little value without such repairs, and that the work of recalking and refastening was in the nature of a continuance of the salvage service, and should rank next after it.

Next will be considered the claim of E. P. Burton & Co., who have filed a libel of intervention wherein they say in the sixth paragraph that:

"The steam tug Thomas Morgan was wrecked and sunk in Cooper river. and in such sunk and wrecked condition was liable to become a total loss if not immediately saved and raised; that so great was the depth of the water where she was sunk, and so heavy the said steam tug Thomas Morgan, that the raising of her required great and continuous power and skill."

The seventh paragraph of their libel is as follows:

"That these libelants, interveners, at the request of the owner, went to the assistance of said steam tug Thomas Morgan, and after continued efforts in the employment of tugs, pile drivers, lighters, tools, ropes, lumber, chains, hawsers, and labor of highest skill, eventually succeeded, after many days, in saving and raising the said steam tug Thomas Morgan, so wrecked and sunk, and enabled her to be brought safely to the port and city of Charleston."

A more grotesque disparity between the services thus postulated and what was actually done by Burton & Co. it would be difficult to conceive. The relations between Burton & Co. and the tug have been already stated. They had a mortgage on her, and they have also filed a statutory lien for supplies advanced under their contract, amounting to $1,562.68. Their interest in the tug, therefore, was obvious. H. W. Blake, the general manager of Burton & Co., examined as a witness in their behalf, testifies that he was approached by Craig, the master of the Morgan, on January 14th; "he wanted to know if I would hire him our pile driver, and any other lighter that we had, to assist in the raising of the Morgan;" and then follows these questions and answers:

"Q. What did you tell him? A. I told him that I did not want to do it, for the reason that the boats were worth a great deal of money to me, as I had arranged to drive some piling in our log pond; and it was only after we tried to find other lighters to assist that I consented to hire the lighters for the raising of the tug, and then I gave instructions to my foreman to take the lighters down and stand by them and keep a watch on them, and do what he could towards the raising of the Morgan. Q. Did you send the pile driver and the lighter to the boat to perform a salvage service, or did you send them down under hire to Mr. Craig—look to Mr. Craig for payment of that money? A. I sent it down under hire expressly stipulated. Q. What price did he agree to pay you for that lighter? A. No price agreed at the time; I told him that I would put it as cheap as I could."

Later on, in reply to direct questions from proctors for Burton & Co., he said that the pile driver and the lighters were sent down to perform a salvage service, and that he knew that Craig had nothing,

and he looked to the Morgan for his pay.  Craig, the master of the Morgan, testifies that after his boat was sunk he went to Burton & Co. and asked them for the use of the lighters, and for the use of some timber to put across the lighters, to assist in raising the boat; that they told him he could have anything he wanted there.  As the result of this negotiation, two lighters belonging to Burton & Co. were sent down to the tug; one of them had an engine aboard, and had been used as a pile driver, but was not at that time fully equipped as a pile driver.  They were in charge of one Bean, a man who had followed various avocations, but who at that time, and for the period covered by this salvage service, appears clearly, from the preponderance of the testimony, to have done no more than serve as a day watchman on the lighter, going home to Charleston every night to sleep, and leaving a colored man in his place as night watchman. These lighters in charge of Bean arrived at the wreck on January 14th.  Bean says that he saved the whistle and some window sash that were floating in the water; that, by cutting away two bundles of logs from the raft which the Morgan had been towing at the time of the wreck, he prevented the rafts from injuring her; that he put a light on the pilot house of the Morgan.  On the fourth day, which was Saturday, January 17th, he says that he went up the river about half a mile, and anchored.  On the Monday following Pregnall says that he found what is called the "pile driver," and the other lighter, about a mile and a half up the river, and that, as he needed a lighter in the salvage operations, he took the pile driver lighter down with him to the wreck, and the other lighter was returned to Burton & Co.  Whatever may be the conclusion as to the nature of the agreement between Blake, the general manager of Burton & Co., and Craig, as to the use of these lighters, it is clear that no salvage service was undertaken or performed from January 14th to January 19th, unless the salvage of the whistle and of the floating window sash is so considered.  No efforts were made or plans conceived for the raising of the wreck, and on Saturday they left the scene.  On Monday, January 19th, Pregnall, who had been employed for the salvage service, and who had devised the plan and provided the equipment, found these lighters in the river, he says, a mile and a half from the wreck, and, as he could use one of them in the carrying out of his plan, that one called the "pile driver" was carried down to the wreck and used as a lighter, the method of operation devised by him requiring a lighter on either side of the Morgan, to which could be fastened the chains which were carried underneath the Morgan by the diver, and the lifting of the wreck was accomplished by the operation of the tides.  The most credible witnesses who have described this operation have testified that the Burton & Co. lighter was used precisely in the same way and for the same purpose as was that of the lighter hired by Pregnall from Johnson & Co., for which he has paid $54; that Burton & Co.'s lighter was not equipped as a pile driver, and was not used as such at all; that there was no engineer or crew aboard this lighter, except Bean, who was a day watchman, and a colored man, who was a night watchman; that the fires were lighted in the engine aboard the Burton lighter simply for the purpose of

warming the men who were aboard. Burton & Co. also furnished certain timber which was used in the salvage operations. They claim compensation for 340 feet of wire cable and 300 feet of manila rope, for the wages paid to the men aboard the lighters, and for repairs to the lighter claimed to have been injured. The total amount of these claims is $984.23, of which $460 is for the use of the pile driver, 23 days at $20 per day. The claim for the wire cable is $76.50. The testimony is that this wire cable was not used in the salvage operations, and that the same is now aboard the tug and at their command. The testimony is that the manila rope was not used, and that it belonged to the Morgan, and was not the property of Burton & Co. at all. The main question is whether or not Burton & Co. rendered any salvage service. The fact that Blake, the general manager of Burton & Co., referred to it as a salvage service, does not help to the conclusion, for little value can be attached to testimony as to understandings post litem motam. Each party has its own views as to what took place and the legal obligations that arose therefrom. In his direct examination he had testified that he had sent down the lighter "under hire expressly stipulated," that "no price was agreed upon at the time, but I told him that I would put it as cheap as I could." If there had been a contract that the lighters were to be paid for at all events, either a sum certain or a reasonable sum, without regard to the success or failure of the efforts to raise the tug, such a contract would be clearly inconsistent with any claim for salvage, and would fall within the rule stated by Judge Blatchford in Squire v. 100 Tons Iron, 22 Fed. Cas. 1017 (No. 13,270). Whether the failure to stipulate for a sum certain for the hire, and the agreement to put it as cheap as he could, and the looking to the tug, when raised, for payment, which it may be fairly understood was his expectation, takes it out of that rule, is a question of some nicety, and requires a consideration of the nature of the salvage service. Salvage is personal in its primary character, and the ingredients of salvage service, as generally stated, are:

"First, enterprise in the salvors in going out in tempestuous weather to assist a ship in distress, risking their lives to save life and property; secondly, the degree of danger and distress from which the property is rescued; thirdly, the degree of labor and skill undergone and displayed by the salvors; fourthly, the time occupied; fifthly, the respective values of the property salved and risked. When all these concur, a large award will be given. When none, or scarcely any, the compensation can hardly be termed a salvage compensation, but it is little more than remuneration pro opere et labore." Newson on the Law of Salvage, p. 1.

To be entitled to salvage remuneration, there must be salvors. What was done by Burton & Co. to put them in that class? That is not their business. Their business is that of sawing lumber. Was Blake, their general manager, a salvor in any sense of the term? Clearly not, for the testimony shows that he never went near the wreck. Was Bean a salvor? The testimony is overwhelming that he devised no plans; that he had neither the equipment nor the knowledge for the conducting of salvage operations; that these operations were conducted and mainly depended for their success upon the operation of the tides, night as well as day, and that he

always went home at night, leaving a colored watchman in his place; that he was a mere watchman. It is true that he was the first to come to the scene of the wreck; that he went in charge of the lighters which were hired by Burton & Co. to Craig, the master, to be used in furtherance of some plan which had not then been determined for the salvage operations; that he left the wreck on Saturday, and anchored his lighters a half mile from the wreck, and that Pregnall, who had been intrusted with the salvage operation, found him there on Monday, and carried one lighter which he needed down to the wreck, dismissing the other, which was never used for any purpose in connection with the salvage. I must conclude, therefore, that Burton & Co. were not, nor were their agents, in any proper sense, salvors of this wreck; that their only relation to it was that of hiring their lighters and other material to Craig, the master, to be used in saving the Morgan, in which they had a large material interest, as they were creditors and lienors, whose claims would be lost if the Morgan was not saved. They were probably animated likewise by their sympathy for Craig, and such material was furnished under the command of that instinctive principle of human nature which suggests the duty of giving succor to the distressed, and, as performance of such duty is not enforceable by any legal sanctions, I am inclined to the opinion that they are entitled to compensation for the use of such material as was actually helpful in the work of salvage, as being of the nature of salvage. Their claim seems to be a highly meritorious one, but, having held that they are not salvors, it may be questioned whether such remuneration should rank with the salvage claim and have priority over other liens. The case has not been presented in that aspect, and the authorities cited in behalf of Burton & Co. are not enlightening upon that point. The pressure upon my time has not permitted an exhaustive examination of the question, and before final distribution of the fund I would prefer to hear further argument. The precise question is whether parties who furnished to the master material to be used in the work of salvage, under an agreement for compensation not fixed, and who looked to the salved vessel for payment, are entitled to remuneration for the material furnished and the labor employed in connection therewith, and that such remuneration shall stand upon the same plane of priority as like material and labor by the actual salvor.

The next question is as to the relative priorities of the other liens, which, with one or two exceptions to be noted, are for materials and supplies furnished to the tug Morgan during the year preceding the disaster. I have already referred to the claim of Pregnall of $293.32 for the repairs, preservation, and restoration of the tug. The testimony shows that, after being raised, the Morgan was carried to Pregnall's shipyard, the tug towing her being compelled to pump her at the same time to keep her afloat, and that she was then hauled on the ways and recalked and refastened. I have already referred to this claim as being, in the circumstances, in the nature of a continuation of the salvage service, and therefore entitled to priority over the other liens for supplies. It is difficult to deduce from conflicting decisions any invariable rule as to the relative rank of mari-

time liens. The rule as to priority which prevails in courts of law, and which is expressed in the maxim, "Qui prior est tempore, portior est jure," has no application. The converse is often the rule, for liens which are in the nature of rewards for benefits done, generally rank against the fund in the inverse order of their attachment on the res, for the thing which is the subject of all the liens ought to pay first those who in the highest degree have contributed to its safety and preservation. This claim of Pregnall for work done and material furnished in the recalking and refastening of the vessel was essential to its preservation and restored its usefulness, so that it became available for the satisfaction of all the other liens, and therefore it is entitled to rank next after the salvage claim. The case differs somewhat from the Ft. Wayne Federal Case No. 3,012, in that here the vessel was in her home port, while in the other the repairs were necessary in order to enable her to reach her home port; but the principle is the same. The repairs seem to have been absolutely necessary to her preservation and usefulness.

All the other liens, it seems to me, should stand upon the same plane. They are for supplies furnished during the year preceding the disaster, and the lien is claimed under the state statute. In the absence of any special circumstances or equities, none of them having added anything to the value of the vessel, or increased the fund which will be realized from the sale, the fund to which they are entitled will be distributed pro rata among them.

The lien of Burton & Co. of $1,562.65 for supplies is objected to because they took a mortgage to secure advances on October 11, 1901; and it is claimed that this mortgage, which was given for the purpose of covering future advances, is inconsistent with the lien which they claim under the statute. Grant v. Strong, 18 Wall. 623, 21 L. Ed. 859, is relied upon to support this objection. In that case Strong filed a bill in equity to establish a mechanic's lien for the sum of $1,547, and the proof showed an agreement between Grant, who was building 16 houses and had employed Strong to do the brickwork thereon, that Strong should take one of the houses, the price of which was fixed, in payment for his work; and the court held that the acceptance and reliance by Strong on another and very different security for the payment for his work was inconsistent with the idea of a mechanic's lien, and that no such lien ever attached in the case. The other case cited, McMurray v. Brown, 91 U. S. 257, 23 L. Ed. 321, likewise related to a mechanic's lien, and only goes to the extent of holding that lien laws do not in general create a lien in favor of a materialman who has accepted in full a different security at the time the contract or agreement was made, such a security being regarded as inconsistent with the intent of the parties that a mechanic's lien should be claimed by the party furnishing building materials; but, if the owner has not fulfilled his contract by paying in the manner stipulated, the mechanic is entitled to his lien. A mortgage is not a lien under the maritime law, and I am of opinion that the taking of the mortgage by Burton & Co., in the circumstances, is not a waiver of the lien which the statute gives; that what was actually done in this case is not inconsistent with the inten-

tion to obtain and hold the lien which the law creates in favor of one who advances supplies to the master. The case would be different if a distinct and independent security had been taken, and it is thus distinguishable from Grant v. Strong and McMurray v. Brown. The amount due Burton & Co. is disputed. Their claim is for $1,562.65. On behalf of Craig, the master, it is contended that the tug Morgan is entitled to freight and towage earnings to the amount of $611.55 more than is credited on the books of E. P. Burton & Co., and this is supported by Craig's memorandum book. An inspection of this book does not satisfy me that it is a book of original entries, but, as Burton & Co. have not produced any books of original entry, I am not able to decide which account is correct, and therefore divide the amount, and allow the lien of Burton & Co. for $1,256.87.

In accordance with this opinion, a decree will be entered directing the sale of the tug Thomas Morgan, and the distribution of the proceeds, after the payment of costs, as follows: (1) To Samuel J. Pregnall for expenses incurred in the salvage operations, $1,039. (2) To Samuel J. Pregnall 25 per cent. of the amount realized at the sale, as compensation for his salvage services. (3) To E. P. Burton & Co. such an amount as may hereafter be determined to be proper remuneration for the use of their lighter and other material in the salvage operations, including therein the amounts paid by them as wages to their employés who were in charge of said lighter, and any amounts paid out by them for material used in the salvage operations, in case it should be determined that such claims are entitled to rank with the claim for salvage. (4) To Frank S. Smith, engineer, the sum of $75 for wages due. (5) To S. J. Pregnall the sum of $293.32, the amount adjudged to be due for work done and materials furnished in the repairs and preservation of the Thomas Morgan after the Morgan was raised. (6) The remainder of the purchase money, after the payment of the above-mentioned prior liens, to be distributed pro rata between the libelant Pregnall on his two liens set forth in the libel, and the intervening libelants who have filed their liens for supplies under the state statute, including therein the claim of Thomas Duggan for $19.12 for supplies furnished in January, 1903. This lien was not recorded, but as the libel was filed February 10th, before the expiration of the 90 days within which it could have been recorded, it does not seem that any recording of it was necessary. The object of such record is to give notice. The suit in rem was notice to all the world.

(June 29, 1903.)

In the opinion filed June 12, 1903, it was held that Burton & Co. were not salvors, nor entitled to salvage remuneration; but the question was reserved whether they were entitled to compensation for the use of their lighter and other material hired to Craig and used in the salvage operation, and whether the compensation to be allowed for the use of such material should stand upon the same plane of priority as like material furnished by the actual salvor, and take rank over the other liens.

I have heard argument upon this point, but no authority has been cited, nor in the pressure of other duties have I been able to find any,

which would seem to authorize the putting of this claim ahead of other liens, and upon the footing of salvage. Owners of salving vessels, who rarely navigate their own ships, and are generally ignorant of the transaction, are entitled to compensation for the use of their vessels, and to a consideration for any actual loss or risk to their property encountered in the service, but they are so entitled because their agent, the master, has performed a salvage service. The right to remuneration for use of the equipments is an incident to the salvage service, and personal service is always a primary condition of a valid claim to salvage. It would not be the less a salvage service if it is performed with only a small degree of skill, for in the infinite diversity of circumstances there are infinite varieties of merit, of services, and of perils; and, as the reward in any case must depend upon the just estimate of the circumstances of that particular case, the court would not withhold compensation from one who has done his share of the work with but a small degree of skill and labor, because another with whom he has co-operated, or under whom he has worked, is entitled to a larger compensation, because he has displayed a higher degree of skill, greater ingenuity, and greater efficiency. It would not therefore follow that Burton & Co. would not be entitled to salvage remuneration because their agent, as compared with Pregnall, is a man of small skill. That he slept in his bed at night when Pregnall was at work would be a circumstance which naturally would be taken into consideration by the court in estimating the value of his services, but if he was a salvor in any true sense he would be entitled to remuneration as such, and, as such, the right to remuneration for the use of the equipment furnished by Burton & Co. would follow as an incident, but as I have already held that Bean was not a salvor in any true sense, that he was merely the watchman employed by Burton & Co. to look after the lighter which they had hired to Craig, I can find no principle upon which I can base a ruling that Burton & Co. are entitled to remuneration for the use of their equipment in the nature of salvage.

It therefore follows that the claim for the hire of the equipment, etc., cannot be allowed as a salvage claim.