**POINT LANDING, INC., Intervenor, Appellant,**

v.

**ALABAMA DRY DOCK & SHIPBUILDING COMPANY et al., Appellees.**

No. 17250.

United States Court of Appeals Fifth Circuit.

Nov. 21, 1958.

T. K. Jackson, Jr., Mobile, Ala., H. Harrell Galloway, Mobile, Ala., Armbrecht, Jackson, McConnell & DeMouy, Mobile, Ala., of counsel, for appellant.

Albert J. Tully, Alexander F. Lankford, Mobile, Ala., Hand, Arendall, Bedsole, Greaves & Johnston and Holberg, Tully & Mobley, Mobile, Ala., of counsel, for appellees.

Before RIVES, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Point Landing, Inc., the Intervenor, appeals from the order which denied it the right to intervene as a maritime lienor against the Tug J. F. Rader or its proceeds. The Court also rejected Intervenor's motion that the amount of the other and prior maritime liens, previously fixed by consent of the lienors without evidence, be set aside for determination after a hearing. All the Court granted was the right of Intervenor to share as a non-maritime lienor

in any surplus remaining after maritime liens and court costs were satisfied. The latter, in the context of this case, was an empty victory as the maritime liens exceeded the $19,000 received on the sale of the vessel under the marshal's hammer.

All of this came about without a single stitch of evidence from a single party, on pleadings alone—several of which, to say the least, presented most glaring questions of fact. As such, it is another case of the shortest way through being the longest way around. It is a sharp reminder that terminating a case on pleadings alone is a tortuous process. Certainly is that so in admiralty, where characteristically pleadings are looked upon with great liberality primarily as the means through which inquiry as to the underlying intrinsic merits is conducted. Seldom may they be a bar to proceeding further.

### The Motion to Dismiss the Appeal

■ Before we can get to a consideration of how such decisive results could thus occur, we are urged to dismiss the appeal for want of fundamental jurisdiction because of a failure to file bonds for costs on appeal, for costs as intervenor below, and to supersede the judgment of the District Court. In addition to these assertions of highly technical imperfections, it is claimed that the decree was not final and appealable and as an interlocutory order it was not one fixing rights and liabilities, hence not appealable under 28 U.S.C.A. § 1292(3).

None of these has any real merit. On the filing of the petition for leave to intervene, intervenor deposited $250 in cash with the District Clerk as security for costs. A local admiralty rule[1] literally permitted this. And where deposited pursuant to such rule, the terms and conditions of that rule, traditionally spelled out in the Stipulation for Costs which every proctor can recite in his sleep, are read into the act of deposit. There was thus a simultaneous triple compliance with the local admiralty rule, the Supreme Court Admiralty Rule 34, 28 U.S.C.A., and the requirement for an appellate cost bond. In effect, the deposit was to " * * * pay all costs awarded against him by this court, and, in case of appeal, by the appellate court * * *." See, The Amable, D.C.E.D.N.Y., 1940, 32 F.Supp. 451, 1940 A.M.C. 1160, and The Brantford City, D.C.S.D.N.Y., 1887, 32 F. 324.

■ We need not determine whether if construed as an interlocutory order, the decree here is one "determining" the rights and liabilities of the parties as 28 U.S.C.A. § 1292(3) requires. We think it is appealable as a final order. It denied as categorically as could be done the right to intervene as a maritime lienor. This was not altered by allowing the intervention as a non-maritime lienor to share in any surplus remaining. At the time the order was entered, the vessel had then been sold and the proceeds of the sale price ($19,-000) deposited in the Registry by the marshal with his Return. Maritime liens had been fixed for $19,206.98 and, by the same order now appealed from, Intervenor had been denied the right to question this amount. To be told that it could come in to share in a surplus which could never exist after distribution of prior claims which it could never question is to close the door after it had been opened but a crack.

1. "Rule 1. Stipulation for costs.—No libel, petition, appearance, or answer shall be received, or third party permitted to intervene or claim; except on the part of the United States, or on the special order of the court, or judge in vacation, or when otherwise provided by law; *unless a deposit in cash;* or a stipulation, satisfactory to the clerk, for costs; shall be first entered into by the party, conditioned that the principal shall pay all costs awarded against him by this court, and, *in case of appeal, by the appellate court,* such stipulations in original suits to be the sum of not less than $50 nor more than $250 in cases in rem and $100 in cases in personam." (Emphasis added.) S.D.Ala. Admiralty Rule 1 (1928), 5 Benedict, Admiralty 169 (6th ed. 1949).

Intervenor was actually and inextricably then in the cold exterior looking in on a warmer hearth. So long as that order stood, it could never get in, or getting in, could get nothing else. If that is not final, then the word has little meaning. Frozen Food Express v. United States, 1956, 351 U.S. 40, 76 S.Ct. 569, 100 L.Ed. 910; Columbia Broadcasting System v. United States, 1942, 316 U.S. 407, 62 S.Ct. 1194, 86 L.Ed. 1563.

■ The failure to file a supersedeas bond is of no real significance to our appellate jurisdiction. The objection proceeds on a misplaced reliance on our former decisions in Canal Steel Works, Inc., v. One Drag Line Dredge, 5 Cir., 1931, 48 F.2d 212, 1931 A.M.C. 1053; The Kotkas, 5 Cir., 1943, 135 F.2d 917, 1943 A.M.C. 831, and The Manuel Arnus, 5 Cir., 1944, 141 F.2d 585, 1944 A.M.C. 417, certiorari denied 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584, 1944 A.M.C. 1351. In those cases, on the failure to supersede a dismissal of the libel, the vessel was released and nothing was before the Appellate Court since upon a reversal there would have been no way to make the order effective or reacquire custody of the thing, i. e., vessel. Here, the Tug J. F. Rader long ago passed from the picture. Substituted in her stead was the $19,000 now safely reposing in the Registry below under an order providing that, " * * all further proceedings in the District Court are stayed pending determination of this appeal." After such an order the District Court could not if it would and would not if it could, disburse these proceeds to the prejudice of Intervenor until our mandate on this appeal had been received. The *res* is very much alive, in the custody of the Court be-low, and thereby subject immediately to the orders of this Court.

### The Merits

How Intervenor never quite got into the race for participation as a lienor against the Tug or her proceeds may be quickly summarized. On November 8, 1957, Alabama Dry Dock, an appellee, filed a Libel in rem asserting a maritime lien for repairs made in 1956. Three weeks later, Harrison Brothers Drydock, the other appellee, filed an Intervening Libel for repairs made to the Tug during the months of March–July 1957. No one filed a Claim to the Tug nor was any Answer filed. On December 20 and 23, respectively, default decrees were entered in favor of Alabama and Harrison.[2]

Two months later, on February 26, 1958, Alabama and Harrison each consented as to the other to the entry of a single order captioned "Final Decrees and Orders." Without any hearing or evidence, the decree fixed Alabama's lien at $2,314.40 and Harrison's at $16,892.58 aggregating $19,206.98. This decree ordered that the Tug be sold by the marshal under a writ of sale which was issued that day. The marshal advertised the sale for March 19, 1958, at which time Harrison bid it in for $19,000. It was not until March 27, over a week later, that Intervenor's petition to intervene was denied. Intervenor's subsequent motion for rehearing complaining that the matter had been adjudicated without evidence, proof or right of cross-examination of witnesses filed March 31, was not overruled until April 7. Thus, at each of the times the Court acted on the intervention, the Tug had been sold and the proceeds were then in the Registry.

2. The decrees were identical (except for describing the movant as "libelant" and "intervening libelant") and provided:
" * * * it is Ordered, that the defaults of all persons who have not appeared and filed claim to the said Tug J. F. Rader, be and the same are hereby entered; and on like motion, it is further Ordered that the Libelant recover herein *the amount due it* by reason of the matters alleged in the libel herein, and that the said Tug J. F. Rader be condemned therefore.
"Further orders are reserved." (Emphasis supplied.)

Significantly, the so-called final decree of February 26 pursuant to a local Admiralty Rule[3] ordered the Clerk to publish a notice calling upon all persons to " * * * propound their claims against the said Tug within thirty (30) days from the date of these final decrees and orders." The Clerk's command was simple and straightforward.[4] Yet, when two days later, on February 28, 1958, Intervenor sought to file its petition for leave to intervene which, for these purposes, satisfied both a petition and a libel asserting a maritime lien, it was met by formal vigorous objections from Alabama and Harrison. Prior to the formal hearing on March 4 on Intervenor's petition to intervene, Harrison filed its detailed Answer in opposition. Alabama repeated it by an Answer subsequently filed with leave of Court. These Answers asserted that (1) Intervenor was guilty of laches because, with knowledge of the pendency of the libel proceedings since their commencement in November 1957, Intervenor had made no effort to come in; and (2) Intervenor had waived (never initially obtained) a maritime lien since it had taken as security for the payment of the cost of the marine engine a promissory note, a chattel mortgage on the Tug, and a mortgage on some Alabama real estate, and had actually instituted proceedings to obtain a State Court judgment on the note and to foreclose the mortgage under a posted sale. Copies of all of the significant papers respecting (2) were annexed as exhibits to the Answers.

Without hearing any evidence, and solely on the pleadings and counsel's arguments, the Court on March 27 denied Intervenor's petition to intervene as a maritime lienor, to reopen the consent decree of February 26 to hear proof on the amount of Alabama's and Harrison's claims, and to order a hearing to receive proof on the amounts and priority of the respective liens. It did permit Intervenor to share as a non-maritime lienor in any surplus.

By denying categorically the right to intervene as a maritime lienor, the Court inexorably held that either (1) a maritime lien never came into being as it was "waived", or (2) if conceived and born with nautical genes, it died from parental neglect and laches. Neither will do.

Laches is much more than time. It is time plus prejudicial harm, and the harm is not merely that one loses what he otherwise would have kept, but that delay has subjected him to a disadvantage in asserting and establishing his claimed right or defense. Gardner v. Panama R. Co., 1951, 342 U.S. 29, 30, 72 S.Ct. 12, 13, 96 L.Ed. 31,

---

3. "Rule 31. Distribution of proceeds of sale of vessels.—Whenever a decree or order shall be entered by this court for the sale of any vessel in a proceeding in admiralty, in rem against the same, the clerk of this court shall cause to be published a notice calling upon all persons interested in said proceedings to propound their claims, which said notice shall be incorporated in each published notice for the sale of the vessel, and shall specify that such *claims should be filed within 30 days from the order of the sale.* Should any claims, other than those of the original libelant, be filed in said cause, the cause should be referred to a special master for the ascertainment of the sum due to each claimant and the order of priority to which the different claimants are entitled to be paid and upon the coming in of the report the money shall be distributed amongst those who presented their claims before the special master in accordance with their respective priorities. Decrees subsequently obtained by persons failing to file their claims within the time allowed shall be paid only out of the remainder, unless the court should otherwise order upon special showing that the delay has been necessarily occasioned." (Emphasis added.) S.D.Ala. Admiralty Rule 31 (1928); 5 Benedict, Admiralty 176 (6th ed. 1949).

4. "Notice is Hereby Given * * * that pursuant to said order of sale, the Tug J. F. Rader * * * will be sold * * * on March 19 * * * and that the proceeds of said sale will be deposited in the Registry * * *. All persons interested in said proceeding are hereby Notified to propound their claims on or before the 26th day of March 1958."

36, 1951 A.M.C. 2048, 2049; See also Annotation, 96 L.Ed. 37, 41; McDaniel v. Gulf and South American Steamship Co., 5 Cir., 1955, 228 F.2d 189, 192, 1956 A.M.C. 105, 108. Nothing in the Answers of Alabama or Harrison remotely suggested that by the two days' delay (February 26–28), they were worse off in proving their own respective maritime liens or in disproving the validity and amount of Intervenor's claimed lien.

Moreover, Intervenor was doing precisely what the "final" decree of February 26 and the Clerk's published notice, note 4, supra, prescribed. Local Admiralty Rule 31, note 3, supra, gave a right to intervene within 30 days. That general rule, whose terms were reflected in an order issued two days before, could not impliedly be rescinded on February 28 by subjecting this particular claimant to some other and more difficult standard, i. e., a demonstration that it had not been dilatory or · if so that such delay had not been harmful. It, like Supreme Court Admiralty Rule 42 " * * * which significantly enough speaks in terms of the 'right' to intervene," United States v. Maryland Casualty Co., 5 Cir., 1956, 235 F.2d 50, 53, 1956 A.M.C. 1822, 1825, extended to all persons asserting any interest the right to come in. The only limitation prescribed was one of time—30 days—and this was spelled out in definitive orders and notices to be March 26, nearly a month after Intervenor sought to come in.

■ Liberality in allowing interventions mirrors not alone admiralty's approach to do ·justice with slight regard to formal matters. It is a recognition of the unavoidable consequence of a sale of a vessel in an in rem proceeding. The sale cuts off the rights of all non-parties. The title from the marshal is good against the world. Unless one claiming a lien is given the opportunity of asserting his right as against the proceeds resulting from the sale which has been made or is in the course of being carried out, the rights are forever and irretriev-

ably lost. 2 Benedict, Admiralty § 231 (6th ed. 1940), Gilmore & Black, Admiralty §§ 9–85 (1957).

The objective of this intervention was exactly the same as though it had been filed on February 25, the day before the decree of sale. Nothing would have been added by the issuance and execution of another Warrant of Seizure. The Tug was then in the marshal's custody under two such writs. Had the petition been so filed and on a hearing a maritime lien was found to exist for a specified amount, this lien would have competed with all other liens on the basis of relative rank and priority likewise determined after a hearing. That is all that was sought by the intervention filed two days after the order of sale.

Unless, therefore, the pleadings showed as a matter of law that Intervenor did not have a maritime lien, this action of the Court deprived Intervenor of a right to come in and prove the existence, validity and priority of its lien. The Admiral, 5 Cir., 1953, 208 F.2d 461, 1954 A.M.C. 92.

■ Alabama and Harrison insist that the issue of waiver is not before us and, presumably, that if we hold, as we do, that laches did not apply, this matter must return to the District Court for determination unaided by advance prediction from us on its proper outcome. We cannot agree. The only basis for the Court's denying the right to intervene as a maritime lienor, while simultaneously granting a right to participate in the surplus as a non-maritime lienor, was a determination that no maritime lien existed. In doing so, the Court adopted these very contentions. Alabama and Harrison may not now escape an authoritative review of the correctness of the action which their pleadings precipitated, and if this leaves them tactically worse off, it is a consequence they must bear.

■ The intervening petition and libel alleged that Intervenor had sold and delivered to the Tug on April 1 a 500 h. p. diesel engine at an initial sale price

of $21,000 with a remaining unpaid balance of $14,400. The Answer, with annexed exhibits, showed that by formal act of sale passed March 30, 1957, before a Louisiana notary public with all civil law solemnities, the vendor sold to Blackwell, the Tug owner, a diesel engine for the price stated for which the vendee delivered his promissory note for the balance of the purchase price and formally granted a chattel mortgage on the Tug to secure payment. As a part of this transaction a real estate mortgage was executed on March 25 covering Alabama real estate given "as additional security for the said obligation." This obligation was described in the mortgage as "the balance due for a motor purchased by the Mortgagors from the Mortgagee, and evidenced by a contract dated the 30th day of March, 1957 * * *." Notice of foreclosure on the real estate was posted in September 1957 and in February 1958 a suit on the promissory note was filed in the Alabama State Court. Neither of these was shown to have resulted in any action.

Alabama and Harrison apparently urged that if this was not an outright waiver of a maritime lien, the circumstances were such that the burden was at least on Intervenor to establish affirmatively that the engine had been sold, not on the credit of the Tug, but solely on the credit of the owner Blackwell. That, of course, ignored the Federal Maritime Lien Statute, 46 U.S.C.A. §§ 971–975, which declares the opposite rule that " * * * it shall not be necessary to allege or prove that credit was given to the vessel." 46 U.S.C.A. § 971. As a natural sanction to that, the Courts have many times declared it to be the burden of one attacking the lien to prove that the personal credit of the owner was alone relied on. See The Astorian, 9 Cir., 1932, 57 F.2d 85, 1932 A.M.C. 660. Of course Section 974 of the Act recognizes that a maritime lien may be waived. But since the furnishing of the supply, repair or necessary to the vessel was presumptively on the credit of the ship, a maritime lien arises unless it is affirma-

tively established that it was done solely on personal credit. The mere taking of a promissory note for the debt or a chattel mortgage on the vessel does not alone or together amount to a waiver. The Fairhope, D.C.E.D.La., 1916, 235 F. 1007; The Little Charley, D.C.D.Md., 1929, 31 F.2d 120, 1929 A.M.C. 398; The Thomas Morgan, D.C.D.S.C., 1903, 123 F. 781; The D. B. Steelman, D.C. E.D.Va., 1880, 48 F. 580; The Denelfred, D.C.E.D.Mich., 1932, 59 F.2d 213, 1932 A.M.C. 1608; The Cimbria, D.C.N.J., 1914, 214 F. 128; El Amigo, 5 Cir., 1923, 285 F. 868, certiorari denied 262 U.S. 751, 43 S.Ct. 700, 67 L.Ed. 1215; Griffin, The Federal Maritime Lien Act, 37 Harv.L.Rev. 15, 47, 48 (1923), reprinted 1924 A.M.C. 206, 234. The real estate mortgage expressly given as additional security did not change this. In a proper case it might well be that all such acts, with other convincing testimony deemed sufficient to establish it by a preponderance of the evidence, might permit the inference that the supplier purposefully intended to forego the valuable privilege which the law accords and look solely to the owner's personal credit. Here there was no such proof.

Indeed, it seems incongruous to argue that the talking of a mortgage on the vessel, the very subject of the maritime lien, is evidence of a purpose to rely solely on the personal credit of the owner. If it proves anything, it proves just the opposite. This is all the more true since any such chattel mortgage by its very nature has little real value against the claims most likely to defeat it— maritime liens for supplies and torts— unless, as this one did not, an outright prohibition against liens is expressed and knowledge thereof imputed to the lienor under Section 973. South Coast Steamship Co. v. Rudbach, 1920, 251 U.S. 519, 40 S.Ct. 233, 64 L.Ed. 386; cf. United States v. Carver, 1923, 260 U.S. 482, 43 S.Ct. 181, 67 L.Ed. 361.

It would be odd if the taking of an inadequate and ineffective security having little real value were to amount either to the establishing of an intention to

abandon all security or as evidence thereof.

Of course Alabama and Harrison will be afforded the opportunity of meeting this severe burden if they can.

Since we hold that Intervenor had a right to intervene and thereafter prove the furnishing of an engine which presumptively gave rise to a maritime lien and there was no basis yet shown for a waiver, we think the Court erred in refusing to reopen the consent decree of February 26 to require proof by Alabama and Harrison of the amount and validity of their liens. It was not the case of a dilatory vessel owner coming in after the 60 days permitted by Supreme Court Admiralty Rule 39 to have a default decree set aside. Rather it was the case of two lienors urging the Court to deny another lienor the right to establish his lien or inquire as to the intrinsic value of theirs, even though up to that point neither had offered anything except a verified libel in support of the *amount* of their respective claims for the reasonable value of repairs furnished the Tug.

We may assume that the demand of Alabama's and Harrison's Libels was sufficiently "liquidated" that the defaulting owner of the Tug who had failed to file Claim and Answer may well have lost the right to require proof of the *amount* of the liens after a default decree. See The Richmond, D.Del., 1924, 2 F.2d 903; The Lopez, D.C.S.D.Ala., 1890, 43 F. 95; Afghan Motor Co. v. The M. V. Silverash, S.D.N.Y., 1942, 46 F.Supp. 306, 1942 A.M.C. 1084; 2 Benedict, Admiralty § 313 at 416 (6th ed. 1940). But other lienors were not in the position of the defaulting owner. To be sure, on a failure to file they would be cut off by the final decree and sale. But until that time if any intervened within the 30 days allowed, they would be entitled to challenge any order subsequent to the default decree if such order had been entered on consent only without requisite proof. This is literally required by local Admiralty Rule 31, note 3, supra. And we need

not determine whether a different result should be reached where the post-decree intervention seeks a further hearing on the amount and validity of other lien claims previously determined and fixed by the Court after hearing and proof. Such intervenors may well have to take the case as they find it. But neither justice nor the orderly administration of it in any way suggests that the lienor who first got a consent order under the default should keep the Court from ascertaining whether that consent decree has unduly prejudiced the substantive rights of another lienor now rightfully in the case, but who was not present or a party to the earlier consent.

The case must therefore be reversed and remanded for a determination on its merits and for further and other consistent proceedings.[5]

Reversed and remanded.

5. This might include under appropriate legal and equitable principles a marshaling of all pertinent assets subject to these liens, maritime or non-maritime.