**INLAND CREDIT CORPORATION,**
Plaintiff-Appellant-Cross Appellee,

v.

**M/T BOW EGRET,** her engines, machinery, nets, tackle, apparel and furniture, *in rem,* and Bow Egret Tanker Corporation, her owner, *in personam,* Defendants,

v.

Constance R. **EARLE,** Intervenor-Appellee-Cross Appellant,

v.

Peter **KENNARD,**
Intervenor-Appellee-Cross
Appellant.

No. 74–3195.

United States Court of Appeals,
Fifth Circuit.

May 27, 1977.

Rehearing Denied July 29, 1977.
See 556 F.2d 756.

J. Michael Mahaffey, Corpus Christi, Tex., for Inland Credit.

Ben H. Sheppard, Jr., Houston, Tex., for Earle.

H. T. Hermansen, Jr., Corpus Christi, Tex., for Kennard.

J. Donald Stillwell, Houston, Tex., for M/T Bow.

Robert M. Julian, Houston, Tex., for Shell Oil.

Before TUTTLE, GOLDBERG and CLARK, Circuit Judges.

TUTTLE, Circuit Judge:

The economic travails of the M/T Bow Egret now compel this Court to review the trial court's effort to perform the familiar judicial task of dividing the limited resources of a debtor among competing creditors. The Bow Egret's journey began with its purchase by the Bow Egret Tanker Corporation (hereinafter Tanker Corporation). Tanker Corporation obtained the funds for the purchase by giving a preferred ship mortgage for $600,000 to Inland Credit Corporation. At first, Tanker Corporation doubtless had high hopes of financial success from a charter to carry grain to India. These hopes were not realized. By the beginning of July, 1973, the vessel had already required significant payments for operating expenses and repairs. Though Tanker Corporation, pursuant to its mortgage agreement, had on May 8, 1973 deposited with Inland Credit some $145,000 as an operating fund to cover such expenses, these repairs depleted the fund to $63,-409.50 by June 12, 1973. Inland Credit insisted that a further $70,000 be deposited in this fund. Tanker Corporation succeeded in borrowing $50,000 from Mrs. Constance R. Earle and the balance of $20,000 from Mr. Peter Kennard, and delivered their checks to Inland Credit on July 5, 1973. Despite the injection of these new funds, Inland Credit chose on July 19, 1973 to foreclose on its mortgage.

Inland brought suit *in rem* against the M/V Bow Egret (which was seized on July 19) and *in personam* against the Bow Egret Tanker Corporation. Subsequently a number of creditors of the vessel and Tanker Corporation intervened. Many of these creditors asserted maritime liens based on their provision of services to the vessel. Of these lien claims, Inland Credit ultimately acquired all but one by assignment. In addition, Earle and Kennard asserted claims based on the advances which they had made.

Pursuant to court order, the Bow Egret was sold, and the proceeds of the sale ($800,100 less costs and fees) were deposited in the registry of the court. The trial court also ordered Inland Credit to pay certain claims out of the funds in the operating account, and then to make a bond for what was evidently deemed the amount remaining in the account ($72,031.69). Certain additional expenditures at court command dropped the bonded operating fund to $61,-721.69.[1]

Subsequently, the court ordered distribution of the proceeds from the sale of the vessel, and this distribution in fact took place shortly thereafter. Since the propriety of this distribution is an issue in the case, it is relevant that the attorney representing Earle and Kennard approved the proposed distribution order "as to form." Moreover, the distribution was carried out without Earle or Kennard (or any other party) seeking a stay of the order or filing a supersedeas bond. This distribution is now the subject of attack in this appeal.

The court's order directed that the maritime liens be satisfied first. Only one lien-

---

1. The basis for the $72,031.69 figure is not clear. Details of the disbursements from the operating account (Appendix at 80) strongly suggest that the correct figure would have been $74,159.50. Since no party actually asserts appealable error in the court's use of the $72,-031.69 figure, however, we will use it as well.

The district court's distribution order observed that the bonded account's final balance was $61,721.69. Earle's brief uses a figure of $61,653.88. We adopt the lower court's figures in this respect as well.

or, Shell Oil, had not assigned its claim to Inland Credit; Shell received $21,344.32 and is not now a party to this appeal. By the same token, Inland won judgment on the lien claims which it had acquired. Inland also prevailed on its preferred ship mortgage (whose priority was second only to the lien claims). The total sum paid to Inland was approximately $784,000, and this left Inland with a deficiency judgment for $118,791.69 plus interest and certain attorneys' fees.

Earle and Kennard were not permitted to share in the distribution of the *res*. The court did direct, however, that they should be paid from the bonded operating fund, and that Earle should recover before Kennard. Because Earle's claim, including interest and attorneys' fees, exceeded the balance remaining in the fund, the effect of this order was that Kennard took nothing.

In this appeal, Earle and Kennard attack the court's decision not to permit them to recover as lien claimants from the proceeds of the sale of the vessel. For its part, Inland challenges the right of Earle and Kennard to priority in recovery from the bonded operating fund. Finally, Kennard contends that Earle should not have been granted priority over Kennard in recovery from the bonded operating fund. An appeal filed by Bow Egret Tanker Corporation has already been dismissed, and is not before the Court.

■ Before we can evaluate the merits of the claim by Earle and Kennard to a share of the *res* funds, we must address Inland's argument that we lack jurisdiction over this issue. Inland contends that *in rem* jurisdiction depends on the court's retention of control of the *res*. It is well established that the sale of the *res* does not destroy jurisdiction, so long as the court continues to exercise control over the proceeds of the sale. But when the proceeds themselves are distributed, and that distribution is not fraudulent or improper, Inland contends, jurisdiction is lost. That is to say, when funds arising from sale of an attached vessel are ordered disbursed, and they are actually paid out of the registry of the court, there can be no appeal from the distribution order.[2]

This rather startling proposition does find support in the case law. Cases in this Court have found jurisdiction destroyed when the *res* was released from the court's control. *See The Manual Arnus*, 141 F.2d 585 (5th Cir.), *cert. denied*, 323 U.S. 728, 65 S.Ct. 63, 89 L.Ed. 584 (1944); *Canal Steel Works, Inc. v. One Drag Line Dredge*, 48 F.2d 212 (5th Cir.), *cert. denied*, 284 U.S. 647, 52 S.Ct. 29, 76 L.Ed. 550 (1931). *Cf. Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861, 864 (5th Cir. 1958) (finding jurisdiction present because *res* proceeds were still in registry of Court); *The Kotkas*, 135 F.2d 917 (5th Cir. 1943). Though our Court has not recently decided a case on this basis, we have adverted to the general rule that removal of the *res* destroys a court's jurisdictional base, *see Platoro Limited v. Unidentified Remains of a Vessel*, 508 F.2d 1113, 1116 (5th Cir. 1975). The Ninth Circuit has applied, though perhaps not embraced, this rule in *American Bank of Wage Claims v. Registry of the District Court of Guam*, 431 F.2d 1215, 1218–19 (9th Cir. 1970).

■ Although we may assume for purposes of this case that this strict rule remains potent, we conclude that our jurisdiction to consider the lower court's *in rem* decision is still extant.

Our starting point is the power (and duty) of the court to restore to a litigant what he has lost by an erroneous judgment, so long as the subject of the controversy and the parties are before the court. *Baltimore & Ohio R.R. Co. v. United States*, 279

2. Ordinarily, of course, the payment by a judgment debtor of the amount of the judgment against him does not affect his right to appeal, even though a reversal in his favor might find him without any source from which he can recoup his earlier payment. (The usual effect of giving a supersedeas bond, then, is simply to provide protection for the winning party below without requiring actual payment of the appealed claim by the losing party). Here, Inland contends that the claimants who permitted the funds to be disbursed rather than obtaining a stay have lost their right to appeal.

U.S. 781, 786, 49 S.Ct. 492, 73 L.Ed. 954 (1929). See Ex parte Morris and Johnson, 76 U.S. (9 Wall.) 605, 19 L.Ed. 799 (1869).

Inland Credit, the plaintiff below, itself filed suit both in rem and in personam. Moreover, Inland is before this Court in part as an appellant, seeking to recapture from Earle a part of her in personam recovery out of the bonded operating fund. Thus it is undeniable that Inland is subject to this Court's in personam jurisdiction. It follows as a matter of course that we possess the power to order Inland to pay judgments in personam. As the Supreme Court put it (in a different context), "The plaintiff having, by his voluntary act in demanding justice from the defendant, submitted himself to the jurisdiction of the court, there is nothing arbitrary or unreasonable in treating him as being there for all purposes for which justice to the defendant requires his presence." Adam v. Saenger, 303 U.S. 59, 67–68, 58 S.Ct. 454, 458, 82 L.Ed. 649 (1938).

We conclude that it is proper for us to exercise our jurisdiction in personam to correct any errors in the lower court's in rem adjudication. We recognize, to be sure, that a strict construction of the limits of in rem actions might bar any appeal of an in rem action unless supported by continued in rem jurisdiction. This narrow view of our jurisdiction, however, is difficult to square with the modern view, now almost a cliché, that in personam jurisdiction can be asserted whenever the defendant has those mini-mum contacts with the forum state that will satisfy " 'traditional notions of fair play and substantial justice.' " International Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945), quoting Milliken v. Meyer, 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940). We need not decide in the present case whether the philosophical underpinnings of the system of in rem jurisdiction in admiralty have been critically shaken. We do decide, however, that where, as here, we find ourselves at the interface of in rem and in personam jurisdiction, we can properly exercise a broad in personam power.

■ We turn, therefore, to the merits of the claim by Earle and Kennard that they were entitled to the status of lien claimants, and thus to priority over all claims against the M/V Bow Egret except other similar liens. The district court recognized that one who advances funds for the payment of lienable claims is himself entitled to a lien if the advance was made "on the credit of the ship" and if the money advanced in fact was used to discharge the claims. Earle and Kennard did advance their funds for this purpose.[3] Moreover, there is a statutory presumption that the money was advanced on the credit of the ship, see 46 U.S.C.A. § 971 (1975), Findley v. Lanasa, 276 F.2d 907, 910 (5th Cir. 1960), a presumption that the district court found had not been rebutted.[4] But the district court held that Earle and Kennard were not entitled to a maritime lien because they had not

---

3. The promissory notes made by Bow Egret Tanker Corporation to Earle and Kennard both begin with the recital "IN CONSIDERATION of advancing funds for payment of existing debts which are material and wage liens against the M/T BOW EGRET. . . ."

4. Inland contends that Earle and Kennard could not be lien creditors because their interest in the profits of the Bow Egret's future operations made them joint venturers. See The Odysseus III, 77 F.Supp. 297, 298–99 (S.D. Fla.1948). Both Earle and Kennard did obtain from Tanker Corporation the promise of a percentage of the vessel's profits, (5% in Earle's case, 2% in Kennard's) to be paid in addition to the repayment of principal and interest on their loans. Kennard strayed even further from the position of the prototypical lien creditor by obtaining a personal guarantee of his loan from Pensley, Tanker Corporation's president. Inland has not suggested, however, that Earle and Kennard were otherwise involved in the vessel's operations. The notes themselves refute the suggestion that these lenders meant to condition the repayment of their principal and interest on the success of its voyages.

One leading admiralty text takes the view that a materialman (a lienor) who "wishes to protect himself by additional security or some form of collateral agreement" (in addition to the credit of the vessel) must proceed with great attention to the formal aspects of the transaction or face the loss of his status as a lien 'claimant. (For example, he should make repeated declarations that the lien is retained). G. Gilmore & C. Black, The Law of Admiralty 552–53 (1957). But the rule in this Circuit is

shown that their loans were in fact used to discharge maritime liens. The court concluded that the loan funds were still in the bonded operating fund.

As Earle points out, the question of what fate befell the loan funds is a somewhat metaphysical one. The injection of the funds of Earle and Kennard had swollen the operating fund to $133,409.50. The final bonded balance, arrived at during the litigation, was $61,653.88. It follows, therefore, that slightly more than the $70,000 advanced by Earle and Kennard was in fact spent by Inland, either of its own volition, or pursuant to judicial orders during this lawsuit. The question therefore is *which* $70,000 it was.[5]

■■ The parties have not referred us to any evidence bearing directly on the question of which funds were used to pay these claims. Indeed, it is difficult to imagine what such evidence would be. Once money is deposited in an account, it is surely fictional to say that its spending is governed by, for instance, a first-in-first-out

inventory system. It seems to us, therefore, that the true question is whether the funds of Earle and Kennard should have been dispensed first. If so, then we may properly conclude that what should have been done was done—in which event Earle and Kennard would now be the holders of lien claims. We could equally say that, if Inland did not do what it should have, its recovery from the *res* proceeds is impressed with a constructive trust for the lien claims that Earle and Kennard ought to have come to possess.[6]

It seems fair to say that the language of the promissory notes from Tanker Corporation to Earle and Kennard bound Tanker Corporation to use their loans (by depositing them in the operating account) for the purpose of paying existing liens. Whether Inland Credit was bound as well, however, depends on what commitments Inland had made either to Tanker Corporation or to Earle and Kennard.

■ There is significant evidence that Inland had indicated its intention to promptly

---

more generous to lien claimants. In *Point Landing, Inc. v. Alabama Dry Dock & Shipbuilding Co.*, 261 F.2d 861 (5th Cir. 1958) this Court concluded that opposing claimants had not yet overcome the presumption that a particular sale was made on the credit of the vessel, despite the fact that the seller took a promissory note from the vessel owner, a chattel mortgage on the vessel, and a real estate mortgage covering some real estate. The court declared that while these facts in a proper case could help make out the requisite showing there was no proof as yet in the case that the supplier of the engine "purposefully intended to forego the valuable privilege which the law accords and look solely to the owner's personal credit." *Id.* at 867. This case was followed recently—though on less striking facts—in *Veverica v. Drill Barge Buccaneer No. 7*, 488 F.2d 880, 883 (5th Cir. 1974). In light of *Point Landing*, we agree with the court below that the presumption that Earle and Kennard were relying on the credit of the vessel had not been overcome.

5. At oral argument, counsel for Inland pointed out that the funds in the operating fund could have been spent on nonlienable claims. He acknowledged however, that virtually all the expenses to which the operating fund could be put were lienable. Though we do not foreclose the issue on remand, we assume that all funds

spent in fact were dispensed for lienable claims.

6. The district court's decision probably reflects a finding of fact, to the effect that these funds were not disbursed. We recognize, of course, that we cannot disturb a finding of fact by the district court unless it be clearly erroneous. The inquiry into "what should have been done," however, does not require us to overturn any of the district court's findings of fact.

The rationale we adopt here is clearly equitable in nature. The capacity of an admiralty court to draw upon equitable principles and powers is somewhat ill-defined. But we have no doubt that the original claim by Earle and Kennard, asserting as it did their possession of maritime lien claims, was squarely within the realm of maritime jurisdiction. A series of cases in the Supreme Court, *see, e. g., Swift & Co. Packers v. [Compania] Colombiana del Caribe*, 339 U.S. 684, 689–95, [70 S.Ct. 861, 94 L.Ed. 1206] (1950), and particularly in our Court, *see Florida Bahamas Lines Ltd. v. Steel Barge "Star 800"*, 433 F.2d 1243, 1248–49 (5th Cir. 1970); *Hadjipateras v. Pacifica, S.A.*, 290 F.2d 697, 703–05 (5th Cir. 1961), have made clear that admiralty courts are much freer today than they may have been in the past to rely upon equitable principles to solve questions which arise in cases whose core is traditionally maritime. We believe this to be such a case.

dispense some of the loan funds. Mr. Stern, President of Inland, acknowledged repeatedly in his deposition testimony that he and Mr. Pensley, Tanker Corporation's president, had understood that $50,000 of the new funds would go to the satisfaction of outstanding liens, and the balance would be left in the operating account. Moreover, Mr. Stern had been presented with a copy of the proposed promissory note to Mrs. Earle, and he had acknowledged in writing that the proposed loan did not violate Inland's mortgage. Certainly, this acknowledgment falls short of an explicit promise to disburse Earle's funds. But the implication of the acknowledgment is surely in that direction.

It is true that the "acknowledgment" was not drafted by Inland and that Inland therefore cannot be charged with responsibility for its vagueness. The absence of an explicit promise to disburse Earle's funds might, indeed, shield Inland from any action by Earle if Inland, after receiving her funds, had decided to foreclose on Tanker Corporation forthwith and had therefore never dispensed any funds at all. Here, however, substantial sums were in fact paid out from the operating fund. Inland, which had insisted on the additional capital, and which had been notified of the terms on which it was obtained, had sole control of the fund and thus it alone could ensure that Tanker Corporation's commitment was honored. Both because of the rather interlocked relationship of Inland Credit and Tanker Corporation, and because of the admittedly ambiguous "go-ahead" given by Inland to Earle directly, we conclude that Inland had an obligation to dispense her funds, at least if it was to dispense any sums from the operating account at all.

█ Whether Inland had any comparable duty as to Kennard's funds is less clear. The testimony of Mr. Stern is that $20,000 of the loan was not to be paid out for existing obligations but placed in the oper-

ating account.[7] If so, then Pensley's promise to spend Kennard's loan on existing lien claims could not have been carried out. Nor could Inland have properly agreed to carry out an impossible promise. Moreover, there is no indication in the record that Kennard sought or obtained the acceptance of his loan that Mrs. Earle obtained from Inland as to hers.

Although there was also evidence in the record from which the district court could have concluded that Inland had received at least some indication of the terms of the Kennard loan, we assume for purposes of this decision that Inland did not in fact have notice of these terms. Inland was aware, however, of Tanker Corporation's business difficulties, and certainly had ample notice of the terms on which Tanker Corporation had secured the initial $50,000 loan. It might well have recognized the likelihood that a lender in such circumstances would seek to arrange terms which would ensure him or her a right to recover before the massive preferred ship mortgage was satisfied. Moreover, it should have been apparent from a reading of the promissory note to Earle that the commitment which Pensley had already made to her—and might be expected to consider making to another lender—could only be honored with Inland's cooperation, since Inland was to have control over the funds. Since Inland inspired Pensley's search for the loan funds, had the means to assure compliance with the obligations Pensley incurred, and had considerable reason to believe that some such obligation would be incurred to Kennard, we hold that Inland should have ascertained the terms of the Kennard loan. Had it done so, to be sure, Inland would still not have been bound by any direct commitment to Kennard, even one as ambiguous as the acknowledgment which had been given to Earle. The powerful position of Inland in this transaction, and the dependent stance of Kennard, however, lead us to conclude that Inland's acceptance of Kennard's funds imposed on Inland the eq-

---

**7.** There is some suggestion in Stern's testimony that $55,000 rather than $50,000 was to be devoted to the immediate discharge of liens. If so, then the amount to be placed in the account would correspondingly be $15,000 rather than $20,000.

uitable duty to attribute to Kennard a portion of the disbursement which it in fact made from the operating account.[8]

Earle has argued, however, that her claim should take priority over Kennard's. It is true that Earle paid more perspicacious attention to the definition of Inland's obligations to her than did Kennard. It may be that Inland, which was aware only of $50,000 in outstanding claims, would have resisted incurring any duty to pay out more than the $50,000 from Earle regarding which it had issued its acknowledgment. But Inland's obligation to disburse extended only to the principal sums loaned to it, rather than to any interest which those sums might earn while in Inland's hands. Since the principal from both loans could have been disbursed in the course of the depletion of the operating account which actually took place, we need not decide the relative priority of the two lenders.

■■■ We hold, therefore, that Earle and Kennard are entitled to recover from Inland the sums in the operating account used by Inland to pay for lien claims. Because slightly more than $70,000 was apparently spent for these purposes, Earle and Kennard will be entitled to recover the full principal of their loans. In addition, the district court observed that "The allowance of pre-judgment interest is within the discretion of the admiralty court, and, generally, it should be allowed from the date of the loss." As the district court did with respect to the lien claims it allowed, we grant Earle and Kennard the right to recover interest at 6% on their loans from the time of loss.[9] Earle and Kennard are also entitled to attorneys' fees. The district court, however, concluded that attorneys' fees could not be awarded *in rem* but only *in personam.* Earle and Kennard were only entitled to participate in the distribution of the *res* proceeds, therefore, to the extent of the principal and interest on their loans. So far as attorneys' fees are concerned, their only recovery would have been *in personam.*

Our decision that Earle and Kennard were entitled to lien claimant status somewhat eases the conflict among the parties on the final issue in this case, the division of the funds remaining in the bonded operating fund. Nevertheless, Earle and Kennard must still look to the operating fund for both attorneys' fees and for a recovery of interest at the rate provided in their promissory notes. Moreover, Inland's deficiency judgment will be increased by the duty we impose upon it to surrender a part of the recovery it obtained below.

■■■ As a result, the conflict between Inland, Earle and Kennard for priority in recovery from this fund must still be dealt with. Earle and Kennard in their briefs assert that they should receive priority over Inland, essentially because of Inland's failure to devote their funds to the payment of existing liens as Earle and Kennard contended Inland should have. Our decision to grant Earle and Kennard lien claimant status removes the force from this argument. Having corrected this error, we do not feel that Inland's stance in this litigation is so inequitable as to deserve further penalty in the form of a special priority for Earle and Kennard in recovery from the operating fund as well.

We are also unpersuaded that the distinctions between Earle and Kennard are such that one's claim to interest and attorneys'

8. It might seem harsh to enforce an obligation to disburse Kennard's $20,000 in light of the evidence that Inland had been notified of, and had formed the intention of paying, only $50,000–$55,000 in existing lien claims, a sum which Earle's loan would have largely covered. In fact, however, slightly over $70,000 was ultimately disbursed from the fund. In this setting, we do not consider it critical that some or all of the claims paid may not have existed at the time of Kennard's loan. Moreover, if Inland had properly inquired into the terms of the Kennard loan, and found them objectionable, then Kennard could have protected his interests either by appropriate modification of the terms or by not making the loan.

9. The rate of interest provided by the promissory notes to Earle and Kennard was much higher than 6%, which is the rate provided for by Texas law in suits on accounts. The promissory notes' rate is inapplicable, since Earle and Kennard are recovering by virtue of their status as lien claimants rather than on their notes.

fees should carry a higher priority than the other's. Hence we hold that Inland, Earle and Kennard should share in the bonded operating fund in proportion to their unsatisfied claims.

In sum, the effect of our decisions is to substantially alter the distribution ordered below. Earle and Kennard should have been permitted to recover from the *res* proceeds the principal and 6% interest on their loans. Since that recovery would have come out of the money paid to Inland on its preferred ship mortgage claim, Earle and Kennard are entitled to judgment against Inland in those amounts. Then, however, Earle, Kennard and Inland should all have been permitted to share in the distribution of the bonded operating fund, in proportion to their various claims. Earle received this entire amount under the lower court's order, and formally, therefore, is required to return to the court that portion to which she was not entitled, for distribution to Inland and Kennard. We leave to the district court the formulation of a practical decree giving effect to these principles.[10]

REVERSED and REMANDED.

---

**10.** We mention once again, *see* note 5 *supra,* that on remand the parties are not foreclosed from addressing the question of whether the disbursements from the operating fund in fact went to pay off lienable claims.