**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Jerry J. COLAHAN, d/b/a IBA of Ohio; Norman F. Bauer; John D. Burrows; Russell C. Humphrey, Jr.; Simon E. Miller; Iba, Inc.; Daniel Belsito, Defendants-Appellants.**

No. 85-3608.

United States Court of Appeals,
Sixth Circuit.

Argued Feb. 27, 1986.

Decided Feb. 5, 1987.

Stanley M. Fisher (argued), Irene Keyse-Walker, Lynn Toler, Arter & Hadden, Cleveland, Ohio, for defendants-appellants.

Randolph Baxter, Asst. U.S. Atty., Cleveland, Ohio, Donald Eliot Segal, Food & Drug Admin., Richard Eugene Geyer, Rockville, Md., David P. Grise, U.S. Dept. of Justice, Jacqueline H. Eagle (argued), Washington, D.C., for plaintiff-appellee.

Before JONES and WELLFORD, Circuit Judges, and GILMORE, District Judge.[*]

WELLFORD, Circuit Judge.

The government obtained an injunction which prohibited defendants-appellants from distributing certain animal drugs on the ground that the drugs were misbranded and not being sold in compliance with 21 C.F.R. § 201.105 (1985). We affirm the holding of the district court with respect to the applicability of section 201.105 to the drug sales in controversy.

Defendants-Appellants in this case are distributors of drugs for use by dairy farmers. They had distributed certain drugs to users without a direct order from a veterinarian. FDA regulations require that some drugs must have a veterinarian's order to be dispensed, 21 C.F.R. § 201.105, and the government contends the drugs at issue fall within those regulations. In November 1978, the government filed a complaint in the lower court seeking an injunction under 21 U.S.C. § 331 (1982) against defendant Jerry Colahan and others. The court issued a temporary restraining order, which was soon replaced by a stipulated order that the defendants would not distribute the drugs without a prescription or other order of a veterinarian.

The defendants then instituted a practice, which came to be called the "slip system," whereby purchasers would aver to the defendants that the drugs were being bought on a veterinarian's order. The buyers signed a form that indicated their name, the drug bought (but not quantity) and the date of purchase. The name of the veterinarian and date of the order were not indicated on these forms.

On October 9, 1979, on defendant Colahan's motion, the district court dissolved the stipulated order, ruling that the FDA lacked the authority to promulgate section 201.105. That court subsequently enjoined the government from prosecuting a similar action in Massachusetts against defendant IBA, Inc. The Massachusetts action was then transferred to Ohio and consolidated with the Colahan case.

The government appealed the district court's October 9 order and on December 11, 1980, this court reversed, holding that section 201.105 was not invalid and that it

---

[*] The Honorable Horace W. Gilmore, United States District Judge for the Eastern District of Michigan, sitting by designation.

was within the agency authority under the statutory scheme. This court remanded the case and directed that the stipulated order be reinstated. *See United States v. Colahan*, 635 F.2d 564 (6th Cir.1980), *cert. denied*, 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981). Upon remand, after further discovery, the parties submitted cross motions for summary judgment, and the district court entered judgment for the government. The district judge issued an order enjoining defendants from distributing the drugs at issue without a direct order from a veterinarian. Thereafter, on defendants' motion and the government's stipulation, the court exempted the drug Nitrofurazone from the order because it was currently available elsewhere without prescription. The court denied defendants' motion to clarify or stay the injunction. Defendants appealed from that injunctive order.

## I.

The government charged that 17 drugs sold by defendants were "misbranded." The violation alleged in this case concerns the manner in which the drugs were sold or distributed with the restrictive labeling on the drugs involved.

Section 301 of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 331 (1982), prohibits the "introduction into interstate commerce of any ... drug ... that is adulterated or misbranded." 21 U.S.C. § 331(a). A drug is misbranded "[u]nless its labeling bears ... adequate directions for use...." 21 U.S.C. § 352(f). "Adequate directions for use" are defined in the regulations as "directions under which the layman can use a drug safely and for the purpose for which it is intended." 21 C.F.R. § 201.5.

The statute requiring adequate directions contains a proviso that if such directions are "not necessary for the protection of the public, the Secretary shall promulgate regulations exempting such drug ... from

such requirement." 21 U.S.C. § 352(f). Under this authority the Secretary promulgated 21 C.F.R. § 201.105, which applies only to veterinary drugs. This regulation was held valid in the previous appeal. It provides (in part):

> A drug intended for veterinary use which, because of toxicity or other potentiality for harmful effect, or the method of its use, is not safe for animal use except under the supervision of a licensed veterinarian, and hence for which "adequate directions for use" cannot be prepared, shall be exempt from [21 U.S.C. 352(f)(1) ] if ...
> (a) the drug is:
> (1) ... to be sold only to or on the prescription or other order of a licensed veterinarian for use in the course of his professional practice; ...
>
> ...
>
> [and]
> (b) The label of the drug bears:
> (1) The statement "Caution: Federal law restricts this drug to use by or on the order of a licensed veterinarian"....[1]

21 C.F.R. § 201.105.

Thus, an animal drug that is described in section 201.105, but either is not sold on the "prescription or other order" of a veterinarian or does not bear the cautionary label, is not in compliance with the regulation and, under the statutory scheme outlined above, is "misbranded." All of the drugs involved in this case are sold with the cautionary label set out in subsection (b)(1) above. We must determine whether the drugs in question are governed by section 201.105 and, if so, whether they are sold on the prescription or other order of a veterinarian.

## II.

The remaining sixteen drugs covered by the injunction in dispute fall into three cate-

---

**1.** This regulation is nearly identical in substance to the statute that governs whether human drugs must bear a cautionary label and be sold only on prescription. *See* 21 U.S.C. §§ 353(b)(1)(B) & 353(b)(4) (1982).

gories. Fourteen are termed New Animal Drugs (NADs) and these form the basis of most of the controversy in this case.[2] Two others, Calphosan B–12 injectable and epinephrine, will be discussed separately.

## A. New Animal Drugs

We first decide whether the fourteen New Animal Drugs (NADs) are governed by section 201.105. The government argues that the drugs fall within section 201.-105 and that these drugs are required to bear the cautionary label as part of their approval as NADs.

The FDA's interpretation of the misbranding provision of the Food, Drug and Cosmetic Act, 21 U.S.C. § 352, is that failure to distribute the controverted drugs in accordance with approved prescription labeling rendered the drugs misbranded under 21 C.F.R. § 201.105. In our first consideration of the issues raised by Colahan and other animal drug distributors, we concluded that FDA had the authority to exempt certain animal drugs from a misbranding action if certain prerequisites were satisfied. Deferring to agency expertise, the prior panel found "correct" FDA's interpretation that "under the proviso contained in § 352(f), it may require by regulation, as it has, that such drugs [NADs] are exempt and thus approved for distribution *only* if the requirements of 21 C.F.R. § 201.105 are met since professional direction, in the words of the statute, 'is necessary for the protection of the public health.'" *United States v. Colahan*, 635 F.2d 564, 567 (6th Cir.1980), *cert. denied*, 454 U.S. 831, 102 S.Ct. 127, 70 L.Ed.2d 108 (1981) (emphasis in original). FDA now argues that the drugs in controversy were approved for distribution only if distributors sold the drugs in conformity with the labeling, which required the drugs to be dispensed only on order of a licensed veterinarian. Under the FDA's construction of the key statutory and regulatory provisions, the approved labeling, therefore, rendered the drugs subject to 21 C.F.R. § 201.105, and defendants' refusal to comply with its requirements revoked the drugs' exemption and rendered them misbranded.

We should give proper weight to the construction of the statute by FDA, the agency to whose skill and expertise Congress entrusted the statute's administration. *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984), *State of Tennessee v. Herrington*, 806 F.2d 642, 653 (6th Cir. 1986). When we review an agency's construction and implementation of the statutory scheme that it administers, two questions must be resolved. Initially it is necessary to determine whether Congress specifically resolved the same issue before us. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A.*, 467 U.S. at 842–43, 104 S.Ct. at 2781. If Congress failed to address the precise issue in question, the court is not free merely to formulate its construction of the statute. *Id.* at 843, 104 S.Ct. at 2781. Rather the reviewing court must defer to the agency's construction and implementation of its statutory scheme as long as it represents a reasonable and permissible interpretation. *Id.; see also Lyng v. Payne*, —— U.S. ——, 106 S.Ct. 2333, 2341–42, 90 L.Ed.2d 921 (1986). Especially when the statute is complex, as is the one in controversy, the Court has admonished reviewing courts not to substitute their judgment for that of the agency. *Chemical Manufacturers Association v. Natural Resources Defense Council, Inc.*, 470 U.S. 116, 125, 105 S.Ct. 1102, 1104, 84 L.Ed.2d 90 (1985); *see also Young v. Community Nutrition Institute*, —— U.S. ——, 106 S.Ct. 2360, 2364, 90 L.Ed.2d 959 (1986).

**2.** The fourteen New Animal Drugs are: Naquasone Bolus, Dexamycin, Dihydrostreptomycin injectable, Oxytocin, Prednisolone injectable, Dexamethasone, Flo-Cillin injectable, Polyflex injectable, BO–SE injectable, Dry-Clox, Gentavet Solution, Hetacin-K, Chloramphenicol, and Mu-Se injectable. Nitrofurazon, the drug removed from the injunction, is also a New Animal Drug.

In this case FDA contends that defendants' failure to comply with the use requirements indicated by the approved NADs' "prescription" labeling renders the drugs as distributed misbranded under 21 U.S.C. § 352(f)(1) and 21 C.F.R. § 201.105. Defendants argue that NAD status, including the requisite label, do not resolve whether the drugs are misbranded under 21 C.F.R. § 201.105. Resolution of these conflicting arguments cannot be made by reference to the statute itself or from legislative history. Since Congress failed to address specifically when an animal drug is deemed misbranded under the statutory scheme, it implicitly delegated to FDA the authority to fill the gap in a reasonable manner. *Chevron U.S.A.*, 467 U.S. at 843, 104 S.Ct. at 2781. To determine whether FDA asserts a permissive statutory construction, a review of the Act and the underlying regulation is in order.

The Food, Drug and Cosmetic Act sets out a "comprehensive scheme for both premarketing clearance and post-marketing regulation of new animal drugs [by FDA]...." *United States v. An Article of Drug Consisting of 4,680 Pails*, 725 F.2d 976, 981 (5th Cir.1984). In *Weinberger v. Hynson, Westcott & Dunning, Inc.*, 412 U.S. 609, 93 S.Ct. 2469, 37 L.Ed.2d 207 (1973), the Supreme Court delineated FDA's role in reviewing new drug applications:

It is clear to us that FDA has power to determine whether particular drugs require an approved NDA in order to be sold to the public. FDA is indeed the administrative agency selected by Congress to administer the Act, and it cannot administer the Act intelligently and ra-

tionally unless it has authority to determine what drugs are 'new drugs'....

\* \* \* \* \* \*

... Judicial relief is available only after administrative remedies have been exhausted.

*Id.* at 624, 627, 93 S.Ct. at 2480, 2481.[3]

■ Initially the Act "leaves it up to the manufacturer of the animal drug to decide whether its product is subject to the [statutory/regulatory] scheme in the first place."[4] *Article of Drug*, 725 F.2d at 981. In seeking FDA approval of an NAD, a manufacturer submits an NAD application, proposing labeling to conform to the application. 21 U.S.C. § 360b(a)(1). FDA has the power to determine whether a drug is an NAD unless the manufacturer can show that the drug product does not meet the conditions. *See, e.g., Premo Pharmaceutical Laboratories, Inc. v. United States*, 629 F.2d 795, 802 (2d Cir.1980) (discussing similar provisions for new drugs for human consumption). Under this statutory and regulatory scheme, the manufacturer can avoid FDA regulation by satisfying its burden of showing by tests, laboratory reports, and other scientific or medical means that the proposed drug is safe for use without the proposed labeling and is not therefore a new animal drug; or the drug may receive NAD approval if FDA is satisfied by the manufacturer's documentation that the proposed drug is safe for use as directed in the labeling. The statute mandates that FDA refuse to approve applications for drugs that are not shown by the manufacturers to be safe for use as directed in the proposed labeling. 21 U.S.C. § 360b(d). A dissatisfied manufacturer may appeal an adverse ruling to a federal

---

**3.** *Hynson* involved drugs intended for human consumption, but the agency process for approving new animal drugs is similar.

**4.** The manufacturer does not need prior FDA approval to market animal drugs that are not NADs as defined at 21 U.S.C. § 360(a)(1). To fall outside of FDA's regulatory power, the drug must be "generally recognized" by qualified experts "as safe and effective for use under the conditions prescribed, recommended, or sug-

gested in the labeling thereof...." *See* 21 U.S.C. § 321(w)(1). If the manufacturer opts not to seek premarketing approval for an animal drug, it runs the risk of being later charged with shipping adulterated animal drugs, in violation of 21 U.S.C. §§ 331(a), 351(a)(5), if or when the Secretary later determines that the manufacturer is producing an NAD which by definition is not recognized generally to be safe and effective.

court of appeals. 21 U.S.C. §§ 355(h), 360b(h).

In this case the manufacturer submitted NAD applications for the controverted drugs and included the following cautionary labels: "Federal law restricts this drug to use by or on the order of a licensed veterinarian." This language conforms to that mandated for a particular class of animal drugs exempted from the misbranding provisions in 21 C.F.R. § 201.105. That regulation exempts drugs from misbranding actions despite their potential toxicity if certain preconditions are satisfied. *One requirement mandates that these potentially toxic drugs be labeled to indicate use only on a veterinarian's prescription or other order.* Based upon the manufacturer's submissions and this proposed labeling, FDA approved NAD applications for the drugs in question.

Subsequently, defendants-retailers sold these drugs without veterinary supervision in contravention of the labeling. FDA then brought a misbranding action, reasoning that its approval of these drugs was contingent upon distributors reselling the drugs in conformity with the drugs' labeling, which limited its sale to "prescription or other order of a licensed veterinarian for use in the course of his professional practice...."; defendants' failure to adhere to the restrictions set forth in 21 C.F.R. § 201.105 would, therefore, under FDA's interpretation, render the drugs misbranded. The sole issue becomes whether FDA can reasonably determine that approval of an NAD with labeling, restricting resale of the drugs only upon a licensed veterinarian's order, renders that NAD subject to 21 C.F.R. § 201.105 and the misbranding provisions without requiring FDA to demonstrate the toxicity of the drugs in a misbranding action.

■ It can be presumed from FDA's approval of these drugs' NAD applications that the drugs in question are safe with the cautionary label. FDA's interpretation of the Act follows logically from this presumption that failure to distribute these drugs in accordance with their labeling,

mandating a veterinarian's order, renders the drugs misbranded under 21 C.F.R. § 201.105. The burden is not upon FDA to establish in a misbranding action that the controverted drugs are in fact "not safe for animal use except under the supervision of a licensed veterinarian" because of "toxicity or other potentiality for harmful effect, or the method of its use," 21 C.F.R. § 201.105, when the manufacturer itself proposes the label that states the NAD is not to be used except upon the order of a licensed veterinarian.

■ The statutory scheme places the burden on the manufacturer in the first instance to show that a proposed NAD is in fact safe for intended use. *See, e.g., Article of Drug,* 725 F.2d 976. Pursuant to 21 C.F.R. § 201.105, FDA may further impose on a manufacturer the additional burden of showing that the proposed labeling and directions permit a layperson to use the drugs safely and properly without veterinary authorization or direction. In this case the manufacturer did not attempt to make that showing but conceded, for whatever reason, that the drugs must be dispensed only on a prescription or other order of a licensed veterinarian by placing labeling in compliance with 21 C.F.R. § 201.105. FDA may reasonably rely on the manufacturer's concession and mandate that the drugs be sold in conformity with the labeling when it approved the drugs' NAD applications. Defendants should not be permitted to bypass FDA procedures and policies and seek to impose upon FDA the burden of proving a fact which was conceded in the original process by which FDA gave its approval to these NADs for the specific uses under defined conditions.

A reviewing court is not free to substitute its own judgment for that of the agency when the agency has set forth a permissible reading of the statutory scheme. We "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question initially had

arisen in a judicial proceeding." *Chevron U.S.A.*, 467 U.S. at 843 n. 11, 104 S.Ct. at 2782 n. 11. The agency's construction of this complex regulatory scheme is reasonable and therefore permissible.

Defendants are not left without recourse. As the government conceded at oral argument, defendants could apply to FDA for reconsideration of the drugs' veterinary "prescription" requirement, by showing that the drugs lack the "potentiality for harmful effect" if used by laypersons or farmers without the supervision of a licensed veterinarian or that similar drugs are readily available over-the-counter without order of a veterinarian. Accordingly, we affirm the district court's decision that these defendants should be enjoined from attempting to distribute, sell, or use these drugs without the express prescription or other written order of a veterinarian. We disagree with defendants' contention that new animal drug provisions are irrelevant in a misbranding action of this kind for the reasons stated.

**B.**

The drugs Calphosan B–12 and epinephrine require a different analysis because they are not approved as NADs as are the fourteen drugs discussed above. They are, however, sold with the cautionary label.

The district court stated that the issue before it was "whether the unapproved animal drug ought to be considered a new animal drug;" that issue, according to the court, turned on whether the drug should be sold only to or on the order of a licensed veterinarian.

These two unapproved drugs, however, bear the same restrictive label as has been discussed concerning the fourteen NADs. The district court granted summary judgment with respect to these two drugs because it determined that there were no material factual issues with respect to the restriction for prescription use only.

In support of the government's motion for summary judgment, it submitted affidavits of two experts and referred to testimony from the Massachusetts hearing on these drugs to establish a scientific basis for the required prescription status of Calphosan and epinephrine. Defendants provided no factual basis to support their position that the two drugs are (or could be) labeled adequately for lay use. Accordingly, we find the district court's injunction with respect to Calphosan B–12 and its declaratory judgment as to epinephrine were appropriate, and we affirm its actions.

**III.**

We turn now to the question whether the defendants' sales practices violated the regulation.

Section 201.105 requires that the drug be "sold only to or on the prescription or other order of a licensed veterinarian...." 21 C.F.R. § 201.105(a)(1). The government contends, and the trial court held, that this requires a direct communication between the veterinarian and the vendor. The defendants argue that the regulation is satisfied if the "prescription or other order" is given by the veterinarian to the buyer and the buyer assures the vendor (the defendants) that such an order exists. The defendants' "slip system" was instituted to document that they had received such an assurance from the buyer.

The defendants first argue that section 201.105 simply does not state that a veterinarian's order must be given directly to the vendor and the court may not read such a requirement into the regulations. We disagree. The analogous provision for prescription human drugs permits dispensing "only (i) upon a written prescription of a practitioner ..., or (ii) upon an oral prescription of such practitioner which is reduced promptly to writing and filed by the pharmacist, or (iii) by refilling any such written or oral prescription if such refilling is authorized by the prescriber...." 21 U.S.C. § 353(b)(1). While this section makes clear that an oral prescription must be communicated directly to the pharmacist, like section 201.105 it does not state that a written prescription must be given to

the vendor. Yet it cannot be contended that the mere representation of a buyer of human prescription drugs that he has a prescription would satisfy section 353. The procedures of both 201.105 and 353 are clearly intended to insure that the respective drugs are used only "under the supervision" of a veterinarian or practitioner. There is no basis for concluding that section 201.105 does not require direct communication where section 353 does. A buyer's statement, even in writing, that he has the order of a veterinarian does not reasonably assure that such an order exists.

The defendants argue that the use of the phrase "prescription *or other order* of a licensed veterinarian" in section 201.-105(a)(1) indicates an intent to permit greater flexibility in the distribution of section 201.105 drugs than of prescription human drugs and therefore the term "other order" should be read to permit orders transmitted through the buyer rather than directly to the vendor. The history of the promulgation of this regulation indicates that, indeed, more flexibility was intended for the sale of section 201.105 drugs, but not of the sort argued for by the defendants. As originally proposed, the predecessor of section 201.105(a)(1) read only "on the order of" and did not contain the words "prescription or other." *See* 17 Fed.Reg. 1130, 1131 (1952) (proposed February 5, 1952). The agency's response to comments on the proposed regulation contains the following passage:

> The American College of Apothecaries and the American Pharmaceutical Ass'n. call attention to the omission of the word "prescription" in subparagraph (1) and to the use instead of "order of a licensed veterinarian." This was done so as not to interfere with the practice, legal in several states, for food stores, animal health stores, and other outlets who do not employ pharmacists to sell restricted drugs on veterinarians' orders. We see no objection to inserting, however, "prescription or other" before "order of a licensed veterinarian."

Memo. of Deputy Comm. of Food and Drugs, April 21, 1952, at 7; II Joint App.

534, 540. Thus, the difference between prescription and order was intended to accommodate the difference between pharmacist and nonpharmacist vendors and not to indicate a relaxation in the manner in which the veterinarian's order could be communicated.

Finally, defendants argue that a requirement of direct communication between veterinarian and vendor is impracticable in an industry in which direct contact with veterinarians is difficult. Dairy farmers should be able, they argue, to obtain a diagnosis and an order for a drug by telephone to the veterinarian and then proceed to the local vendor to purchase the drug. We do not see that the farmer's need for expediency would be significantly hampered by having the veterinarian telephone the farmer's vendor to provide the direct prescription or other order that the regulation requires. The defendants also assert that the farmer's freedom to choose his own vendor will be limited and he will be somehow forced to purchase drugs at greater cost directly from the veterinarian. If such practices are actually engaged in by the nation's licensed veterinarians, we believe there are remedies available in the event of abuse. A requirement that unsafe animal drugs be sold only on the direct order of a veterinarian in order to insure that the veterinarian actually supervises their use does not significantly contribute to the problems defendants predict but does protect the farmers, the animals, and the public that consumes the food products of the livestock against potential harm from improper use or sale of these unsafe drugs. The district court's ruling on this issue is accordingly affirmed.

### IV.

In summary, we AFFIRM the actions of the district court with respect to both the NAD and the other two drugs, Calphosan B–12 and epinephrine, and we also AFFIRM its ruling with respect to requiring a written order from a licensed veterinarian for their proper use.

NATHANIEL R. JONES, Circuit Judge, concurring in part and dissenting in part.

The majority opinion affirms the district court's decision to enjoin the distribution of certain animal drugs on the ground that the drugs are misbranded because they are not sold in compliance with 21 C.F.R. § 201.105 (1986). For the reasons discussed below, I disagree and would reverse the judgment of the district court. I do, however, concur in Part III of the majority opinion, where the majority affirms the district court's ruling requiring a written order from a licensed veterinarian in order to distribute the challenged drugs.

As discussed in the majority opinion, the district court's injunction covered sixteen drugs falling into three categories. I will first address the appropriateness of the injunction placed on the fourteen New Animal Drugs. Next, I will discuss the injunctions placed on the two other drugs, Calphosan B–12 injectable and epinephrine.

### A.

The majority holds that the FDA can "determine that approval of an NAD with labeling, restricting resale of the drugs only upon a licensed veterinarian's order, renders that NAD subject to 21 C.F.R. § 201.105 and the misbranding provisions *without requiring the FDA to demonstrate the toxicity of the drugs in a misbranding action.*" (Maj. op. at 292) (emphasis added). In my view, it is improper to allow the government to shortcut the proof necessary to show the applicability of section 201.105 to these drugs.

The government did not attempt to show directly that these drugs are ones which "because of toxicity or other potentiality for harmful effect, or the method of [their] use, [are] not safe for animal use except under the supervision of a licensed veterinarian," which is the factual predicate for coverage by section 201.105 as stated in the regulation. Rather, it argued that the

drugs fall within section 201.105 solely because they are required to bear the cautionary label as part of their approval as New Animal Drugs. Essentially the government's position is that by virtue of bearing the cautionary label for New Animal Drug purposes these compounds have achieved the status of "prescription animal drugs" [1] and, by that fact alone, they fall within section 201.105 coverage. I find nothing in the statutes or regulations that prescribes this reasoning and I cannot accept it *per se.* I think we must instead determine whether the findings necessarily made during the NAD approval process, and which resulted in a requirement that these drugs bear the cautionary label, collaterally establish the factual predicate of section 201.105 that the drug is unsafe for use without veterinary supervision.

A New Animal Drug is defined as an animal drug that is

(1) ... *not generally recognized,* among experts qualified ... to evaluate the safety and effectiveness of animal drugs, *as safe and effective* for use under the conditions prescribed, recommended, or suggested in the labeling thereof; ... or (2) ... [which] has become so recognized but which has not ... been used to a material extent or for a material time under such conditions....

21 U.S.C. § 321(w) (1982) (emphasis added). Clearly nothing in this definition establishes that, merely by being an NAD, a drug is unsafe for use without veterinary supervision under section 201.105. The most this definition establishes is that the drug is not *recognized* as safe as labeled.

The introduction into interstate commerce of an NAD is prohibited by the Act unless an NAD application has been approved for the drug, and the drug and its labeling conform to the application. 21 U.S.C. §§ 331(a), 351(a)(5), 360b(a)(1) (1982). A manufacturer who seeks NAD approval for a drug must submit, as part of the

---

1. Although the government has used the term "prescription animal drugs" in arguments before the district court and throughout its brief, the phrase does not appear in the statutes or regulations. For this reason, and because the phrase supports the government's position through labeling rather than analysis, I do not adopt it.

application, reports of investigations of the safety and effectiveness of the drug and "specimens for the labeling proposed to be used for such drug." 21 U.S.C. § 360b(b)(1) & (6). There are no specific standards that the labeling must meet, but the Secretary is directed to refuse approval of the application if the reports submitted do not show that the drug is safe for use as directed in the proposed labeling. 21 U.S.C. § 360b(d).

The approved application for each of the fourteen NAD's in this case provides that the drug carry the cautionary label. Under the approval scheme outlined above, however, the approval of these applications does not amount to a finding by the Secretary that these drugs are unsafe without such a label for two reasons. First, because labeling is proposed initially by the applicant, the Secretary has only to consider whether such labeling is sufficient, not whether it is necessary. The government admits that more than half of all approved NAD applications do not provide for the cautionary label. The Secretary does not decide what the label should contain, only whether the proposed label is sufficient. It is possible that the applicant for each of these NAD's submitted labeling containing the cautionary label in order to help ease approval, while the Secretary might have approved the drug without the cautionary label if it had been so submitted. Thus, all that can be presumed from the NAD application approval is that the drug is safe with the cautionary label; it does not follow that the label is necessary to make the drug safe.

Second, even if the Secretary had specifically required that these drugs bear the cautionary label, the factual prerequisites of that conclusion are not necessarily the same as those for section 201.105. Assuming that the Secretary has approved these NAD's only if they carry the cautionary label, the reasons for that decision could have been because, at the time of approval, (1) the tests were insufficient to establish whether or not the drug was safe for lay use, (2) the tests although adequate, were inconclusive, or (3) the tests in fact showed

that the drugs were unsafe except under supervision of a veterinarian. *See generally* 21 U.S.C. § 360b(d). Section 201.105 requires an affirmative showing that a drug is unsafe for use without veterinary supervision. Only one of several grounds for the Secretary's decision on a NAD approval would establish this required showing.

The collateral use of the NAD status of these drugs as proof that they are unsafe under section 201.105 thus relies on two possibly invalid assumptions: first, that the Secretary actually considered whether or not the drugs required the cautionary label and, if so, second, that the decision was based on a finding that the drugs were in fact unsafe without the label. Additional facts about the history of the NAD application approval of each of these drugs are necessary in order to validate these assumptions, but have not been presented. The district court accepted the government's argument, and its ruling that the New Animal Drugs are covered by section 201.105 was based solely on the improper collateral use of the NAD application approval. Thus, there was no showing that the drugs are in fact unsafe for use without veterinary supervision. Therefore, I would vacate the injunction as to the fourteen drugs.

**B.**

The district court stated that the issue before it with regard to Calphosan B–12 was "whether the unapproved animal drug ought to be considered a new animal drug"; that issue, according to the court, turned on whether the drug should be sold only to or on the order of a licensed veterinarian. Both statements are incorrect. First, because many NAD's are approved without the cautionary label, the need for veterinary supervision is not necessary or sufficient for NAD status. Secondly, and more importantly, NAD status does not establish that the drug is unsafe under section 201.-105. The government argues that, regardless of these errors, the trial court's find-

ing—that Calphosan should be sold only on the order of a veterinarian—is sufficient to establish the predicate finding required by 201.105. I disagree.

The only evidence considered by the district court and referred to by the government concerning the safety of Calphosan was contained in the affidavit of Dr. Vitolis Vengris and the hearing testimony of Dr. Arthur Aronson. Dr. Vengris, a veterinarian who evaluates drugs for the FDA, stated that Calphosan is a vitamin supplement and that a diagnosis that the supplement is needed can be made only by a veterinarian with laboratory tests. Unneeded use of the drug, Dr. Vengris stated, "would be wasteful and costly to the owner," and injections "might needlessly expose the animals to possible infections." Dr. Aronson stated only that complex laboratory tests are required to determine if the drug is needed. Neither of these statements go to the finding required by section 201.105: "because of toxicity or other potentiality for harmful effect, or the method of its use, [the drug] is not safe" for use without veterinary supervision. It is not enough that a veterinarian is needed to determine whether the drug is indicated; the regulation is concerned with whether harm will result from unsupervised use. Neither doctor stated that the drug is harmful. Dr. Vengris's statement about the risk of infection is ambiguous. The concern may be based only on the fact that the drug is injected. It does not appear to be the Secretary's position that injected drugs are conclusively unsafe under section 201.105, for at least one drug, epinephrine, is allowed to be sold over the counter in 10-milliliter vials for administration by injection. *See* 21 C.F.R. § 500.65. This ambiguous statement is not enough to support a finding that the drug is unsafe under section 201.105, and I would vacate the injunction as it relates to Calphosan B-12 as well.

### C.

The drug epinephrine is governed by its own regulation. That regulation provides that epinephrine can be sold without a pre-scription in dosages of 10 milliliters or less. 21 C.F.R. § 500.65 (1986). The government claimed that the defendants dispensed this drug in 30-milliliter vials. The district court ruled, however, that, for lack of evidence, the government was not entitled to summary judgment on the question of whether section 500.65 was violated, and therefore an injunction could not issue. The court then issued a declaratory judgment that epinephrine was not to be sold in excess of 10-milliliter dosages, citing the declaratory judgment statute, 28 U.S.C. § 2201 (Supp. III 1985).

In essence the court has done no more than declare that section 500.65 applies to the drug and that it prohibits sales in dosages of over 10 milliliters without a prescription. The defendants do not challenge the regulation itself. Consequently, there was no controversy about the issue that the court decided. In absence of an actual controversy, declaratory relief is not proper. *See* 28 U.S.C. § 2201(a); *Jervis B. Webb Co. v. Southern Systems, Inc.*, 742 F.2d 1388, 1399 (Fed.Cir.1984). Therefore, I would also vacate the order as it relates to epinephrine.